MILLER et al., Respondents, v. CHICAGO, R. I. & P. Co., Appellant

(40 N. W.2d 324)

(File No. 9045. Opinion filed December 15, 1949)

Rehearing denied January 26, 1950

**Boyce, Warren, Murphy & McDowell,** Sioux Falls, for Appellant.

**Davenport, Evans & Hurwitz,** Sioux Falls, for Respondents.

HAYES, J.   Plaintiffs sued the railway company for damages resulting from a collision between plaintiffs' trailer-transport and one of defendant's locomotives.   This appeal by defendant is from a verdict and judgment awarding a recovery to plaintiffs in the sum of $2600.

The scene of the collision is a railroad crossing at Second Avenue, City of Sioux Falls.   The directional course of the avenue is north and south; the railway, east and west. Although the width of Second Avenue is not established, photographs before us indicate that the pavement thereon for vehicular travel is of normal width for urban traffic. These photographs disclose also the location of buildings, trees, poles and other obstructions to a motorist's view of the railway tracks and train movements thereon as he would proceed along the avenue and cross the defendant's tracks.   Some distance to the north of the tracks whereon the collision occurred are five pairs of tracks approximately paralleling the same and traversing the avenue.   The distance between the southernmost of the five tracks just mentioned and the tracks where the collision occurred is not shown other than by the photographs referred to above.   Therefrom it appears that parked motor vehicles, a frame structure and a driveway on the westerly side of the avenue leading to a freight station and loading platform occupied most of the area between the multiple tracks

to the north and the single set of tracks to the south. During the trial of the case the distance between the northernmost tracks and those where the collision occurred was estimated at about half a block.

Plaintiff Keith Miller, a part owner of the damaged transport, was the driver of the tractor to which the same was attached at the time of the collision. The over-all length of the tractor and trailer-transport was 45 feet. The combined weight of the two, the latter then carrying 4900 gallons of gasoline, was about 52,000 pounds or 26 tons.

Proceeding southward along the westerly side of the avenue Miller stopped his outfit short of the northernmost set of railroad tracks. He was familiar with his present course of travel, an established truck route. It was then during afternoon daylight. As he approached the tracks to the south he observed defendant's engine standing thereon 35 to 45 feet west of the western edge of the highway or avenue. Before attempting to cross these tracks, and when only 10 or 12 feet north thereof, he again looked to the west and saw the engine in the same stationary position. He heard no train whistle or bell and thereupon, and without stopping, continued forward with his tractor in a power gear, second to the lowest, at a rate of speed from five to seven miles per hour. After moving forward a distance sufficient to place the front wheels of his tractor upon the railroad tracks he saw the engine bearing down upon him. He attempted to swerve to the left and to accelerate his speed and thus avoid the impending collision, but without success.

Whether or not defendant's engine was moving toward the avenue, with bell ringing, is sharply disputed. However, assuming negligence on the part of defendant's servants, we accept plaintiffs' version of the facts as above related.

Under assignments of error argued here defendant urges the contention that the failure of Miller to stop his tractor, and trailer-transport loaded with gasoline, before he moved onto defendant's tracks constituted contributory negligence and barred plaintiffs' recovery. This issue of law was raised and presented to the trial court and was by the learned judge thereof decided against defendant.

Miller's reasons for not stopping are stated in his answer to a question inquiring whether the accident would have been avoided had he stopped before moving onto the railway tracks. He replied: "I could have come to a complete stop but there was traffic there, there was cars behind me, the train was parked there—I didn't want to tie up the traffic any more than necessary. I did stop at the track there to the north of them, and they are all together there. I figured they were the same group of tracks. I didn't see no sign there, no warning of any kind. I just didn't figure I should stop in the middle of the tracks and stall anybody else behind there on the tracks. It is pretty dangerous." From this answer it is plain that as he approached the tracks, the rail engine not moving, Miller was impressed with the idea that because of cars following him along this truck route he should not stall or stop and thus place one or more of these vehicles upon the tracks behind him. He thought such action on his part would have been dangerous to others. He took the view that his stopping at the tracks half a block north was a sufficient compliance with the law because all six tracks are more or less together and form a multiple or group crossing. Counsel for plaintiffs insist that Miller's conduct preceding the collision was that of a careful and thoughtful driver and that under the circumstances he could not be charged with negligence. Were it not for provisions of our code specifically applicable to this case we would readily agree that Miller's proper course was to have proceeded as was required of a person exercising ordinary prudence as he drove a common motor vehicle upon the tracks in question under the circumstances then existing.

SDC 44.0304 lays down in plain terms the standard of conduct required of Miller before he made any attempt to enter the danger zone, the railroad tracks. The duties imposed upon him were two: first, to stop; second, "to ascertain when such crossing can be made in safety". To the same effect is SDC 28.0903. It must be conceded that had Miller conformed to the required standard plaintiffs' gasoline transport, loaded with inflammable liquid, would have escaped the damaging impact with defendant's engine.

Agreeing that every railroad crossing is potentially dangerous we think that the expressed concern of Miller for the safety of vehicles following his outfit clothed him with no excuse for departing from the standard of conduct to which the law then specifically required his full conformance. The avoidance of a collision at the place he approached, rather than an inconvenience or possible danger to someone behind him, was declared by law to be his particular responsibility. Nothing in the record suggests that there was or would have been immediate or impending danger to any vehicle which may have been required to pause behind him if he had stopped and determined that it was safe for him to make the crossing he then approached. Nor does it appear that his stopping would have prevented anyone following him from overtaking his slow moving vehicle and reaching a position of more safety.

■ ■ The fact that Miller stopped before reaching the tracks lying north of the freight depot is of no consequence. From the point of this stopping he could not have ascertained that it was or would be safe for him to cross the tracks where the collision occurred when he reached those tracks. The obstructions mentioned above denied him views from that point by which he might have observed conditions at the southernmost tracks and thereupon learned that a crossing of all tracks before him could be made in safety. Miller testified that he first saw defendant's engine when he reached a point 50 to 75 feet north of the south tracks. The fair inference is that he would have seen it at a greater distance had it been possible for him to do so. That he did not see, and perhaps could not have seen, the engine until after he had stopped and then moved some distance southward and across the tracks, or most of them, north of the freight depot makes it manifest that Miller could not have decided at the point where he stopped that a safe crossing was to be made at the south tracks when he arrived thereat. We think that the rule applicable here is found in Vol. 3, Blashfield's Cyclopedia of Automobile Law, Permanent Edition, § 1826. It is there stated: "Ordinarily, where there is a duty, either specifically or under the particular facts as essential to due care, to stop for the purpose

of looking and listening, the driver must, in order to fulfill such obligation, stop at a place where looking and listening will be reasonably effective. He is not deemed negligent in failing to stop at a time or place prior to that at which the view becomes effective. Indeed, it is no discharge of the duty and does not absolve him from negligence, that he stopped at such prior time and place."

The effect of the statute is to require of the drivers of loaded gasoline transports the utmost care on their part in avoiding collisions with railroad engines, trains, etc. The law was intended to eliminate the consequences of disasters involving or likely to involve the public. To accomplish this aim the clear command to the driver of a loaded gasoline transport is that he first stop and then find out that he will encounter no danger if he crosses the tracks. Should we interpret the applicable code provisions as contended by plaintiffs' counsel the result would be a substitute for that which is plainly written into law and a lower standard of conduct for drivers of the special class now charged with the duty to avoid the common danger at railroad crossings. But a little tinkering with the clause of the statute, i. e., "to ascertain when such crossing can be made in safety", would reduce the legislative mandate to the general rule governing the conduct of drivers of ordinary motor vehicles.

The provisions of SDC 44.0304 we are called upon to construe in the instant case have not in any prior opinion of this court received judicial interpretation. The same were a part of Section 5½ of the Uniform Motor Vehicle Act adopted by the legislature of this state in 1929. Similar provisions of the Iowa Code were recently construed in Chicago, B. & Q. R. Co. v. Ruan Transp. Corporation, 8 Cir., 171 F.2d 781, 788, a case involving a collision between a vehicle such as plaintiffs' and a passenger train occurring at a group crossing of five railroad tracks in the town of Bettendorf, Iowa. With respect to the statute the opinion declares: "The command is that the driver shall not proceed until he knows that to proceed is safe. * * * He had no right to assume what he could not know." We agree with this construction.

█ Miller took a chance on a guess and he now argues that the wrong guess was justifiable. It was either safe or dangerous for him to go forward. The law says he was bound to know that it was safe and that he must stop in order to acquire the knowledge of safety. He did not stop and it is obvious that he entered a path of danger assuming instead of knowing that harm would not result from his traversing that path with his extended and heavily laden transport. A brief pause would have enabled him to know of the danger he assumed not to be impending. His failure to stop and to ascertain that it was then safe for him to cross the tracks fell far short of the duty the law expressly imposed upon him and constituted negligence contributing to the harm which thereupon and therefrom ensued.

The judgment appealed from is reversed and the case remanded with directions to dismiss plaintiffs' complaint.

SMITH, P.J., and ROBERTS, J., concur.
RUDOLPH and SICKEL, JJ., dissent.