EKREN

v.

MINNEAPOLIS, ST. P. & S. S. M. R. CO.

No. 7360.

Supreme Court of North Dakota.

Nov. 19, 1953.

Rehearing Denied Dec. 4, 1953.

194

Rittgers, Hjellum & Weiss, Jamestown, J. F. X. Conmy, Fargo, for plaintiff and respondent.

Aylmer & Butts, Jamestown, Conmy & Conmy, Fargo, for defendant and appellant.

SATHRE, Judge.

The plaintiff brings this action against the defendant for damages for personal injury and property damages resulting from a collision between his car and the defendant's train on a crossing at Kensal, Stutsman County, North Dakota. He alleges in his complaint that the accident was due to the negligence of the defendant in failing to give proper signals when approaching the crossing and for failing to maintain proper safeguards at said crossing. In its answer the defendant denies any negligence on its part and alleges that the accident and damages to the plaintiff were due to plaintiff's own contributory negligence. The case was tried to the court and a jury and the issues raised by the pleadings were submitted to the jury and a verdict was returned in favor of the plaintiff upon which verdict judgment was entered. From this judgment defendant has appealed. At the close of plaintiff's case the defendant made a motion for a directed verdict in its favor upon the grounds that there is no testimony in the record showing any negligence on the part of the defendant proximately causing the plaintiff's injuries and losses if any; and that the undisputed evidence shows the plaintiff to have been guilty of contributory negligence as a matter of law which contributory negligence was a proximate cause of his losses and injuries. Motion was also made for dismissal of the action upon the

same grounds. Both motions were denied by the trial court. At the close of the case when both parties had rested the defendant made a motion for a directed verdict upon the same grounds stated in the motion for a judgment of dismissal at the close of the plaintiff's case. The motion was denied and the case was submitted to the jury. After the verdict the defendant made a motion for judgment notwithstanding the verdict upon the grounds and for the same reason as stated in the previous motions, which motion was denied by the trial court. The defendant appealed from the judgment assigning numerous errors all of which rest upon the contention that there is no evidence in the case establishing negligence on the part of the defendant and that the evidence shows conclusively that the plaintiff was guilty of contributory negligence as a matter of law, and that his injuries and damages if any were the result of his own contributory negligence.

The defendant on this appeal has challenged the sufficiency of the evidence to sustain the verdict. It will be necessary therefore in considering the evidence, to take the view most favorable to the plaintiff. The defendant has pleaded contributory negligence and therefore the burden is upon the defendant to establish this defense by a preponderance of the evidence. If the defendant was negligent in the respects charged, the verdict must stand, unless it is established that the collision was due to the contributory negligence of the plaintiff. It is well settled that the question of contributory negligence is one of fact for the jury and becomes a question of law only when reasonable men can draw but one conclusion from the evidence. Martin v. Parkins, 55 N.D. 339, 213 N.W. 574, and cases there cited.

There is a sharp conflict in the evidence as to whether or not the defendant's train gave proper warning in approaching the crossing in question by sounding the whistle and ringing the bell. The witnesses for the plaintiff all testified that the train did not sound the whistle nor ring the bell. Many of them said that they were in their

usual places of business at the time of the accident and that ordinarily they could hear the whistle and the ringing of the bell of trains coming into Kensal. The train crew, however, that is, the engineer, fireman and flagman all testified that they heard the whistle and that the bell was ringing as usual at all of the crossings and particularly at the crossing in Kensal where the collision occurred. However for the purpose of this opinion we shall assume that the defendants were negligent in failing to sound the whistle and to ring the bell in approaching this crossing. On that theory we will proceed to examine the record in order to ascertain whether it is possible to say, viewing the evidence in the light most favorable to the plaintiff, that he was negligent as a matter of law.

There is no dispute as to the physical facts in this case. The village of Kensal where the accident occurred has a population of 375 to 400 people. The Soo line railroad runs through the village in an easterly and westerly direction. There are three tracks, the service or house track to the south, next the passing track and lastly the main track. The accident occurred shortly before nine o'clock on the morning of November 12th at what is known as the east crossing which is approximately 626 feet east of the depot in Kensal. It was a cold morning and the sky was overcast but the visibility was good. The highway upon which the plaintiff was driving is near the south edge of Kensal and turns north and crosses the east crossing at practically right angles. There were box cars on the service or house track on each side of this crossing. There were also grain elevators and other places of business such as coal sheds and an oil station located along the south side of the service track. The freight cars on each side of the crossing and the elevators and other buildings obstructed the view of anyone approaching the crossing from the south. Neither the passing track nor the main track could be seen from the highway immediately south of the service track. The terrain to the east and west of the crossing was practically level or flat and there were no natural obstructions to interfere with a person's view east and west after crossing the service track. The plaintiff was taking his two boys and a neighbor boy to school on the morning of the accident. When he was from 25 to 30 feet south from the first or service track he stopped. However, as has been pointed out, at the place where he stopped his car his view was entirely obstructed so that he could not see either the service track or the main track or any part of the area east or west of these two tracks. After he stopped 25 or 30 feet to the south of the service track he proceeded to cross all three tracks without stopping. He stated that he was traveling at a speed of from 6 to 8 miles per hour; that when he started to cross the service track he intended to cross all three tracks without stopping, notwithstanding the fact that at the place where he did stop his view was obstructed both east and west, making it impossible for him to see whether or not there were any trains approaching on the passing track or on the main track east or west of the crossing. He said he looked to the west to see if there was a switch engine near the depot which is located some 626 feet west of the railroad crossing, and that he did not look east because, as he said, he did not have time; that he proceeded to cross the passing track and main track without intending to stop, and then the collision occurred.

The distance from the north rail of the house or service track to the south rail of the main track is 43 feet 3½ inches. The exact distances between the house track and the passing track and between the passing track and the main track are not shown in the record, but the plaintiff testified that he paced the distances and that the distance between the house track and the passing track was 9 paces and the distance between the passing track and the main track was 6 paces. He estimated that his paces were about 3 feet which would make the distance between the house track and the passing track approximately 27 feet and the distance between the passing track and the main track about 18 feet. There was introduced in evidence two plats, defendants exhibits C and D, prepared by Martin Ha-

gen an assistant engineer, employed by the engineering department of the defendant. These plats were drawn to scale and show the crossing where the accident occurred and the surrounding areas east and west of the crossing. Exhibit C, is drawn to the scale of 1 inch to 100 feet and shows the service track, the passing track and the main track. It also shows the elevators and other business places south of the service track and east and west of the crossing; also the freight cars on the service track east and west of the crossing. Exhibit D, a smaller plat is drawn to the scale of 1 inch to 20 feet. It shows the highway crossing where the accident occurred, and the 3 tracks more in detail than defendants exhibit C. It shows also the planking of the 3 tracks, the box cars and the elevators on the west and east sides of the crossing. It also shows the crossing signs or cross-bucks to the north and west of the main line and to the south and east of the house tracks; there is some dispute in the testimony as to the width of the opening between the freight cars on the crossing. The plaintiff testified that it was from 15 to 16 feet but that he could nicely pass through. One of plaintiff's witnesses testified that he paced it and that it was 8 paces and that his steps were about 3 feet which would make the opening on the crossing 24 feet wide. The defendant's witnesses testified that the opening was from 24 to 30 feet. At the trial the witness Hagen projected a line on exhibit D, extending from a point 60 feet south from the center line of the main track in a northeasterly direction clearing all permanent obstructions to a point where it would intersect the main track. This point of intersection was 227 feet east from the center of the crossing on the main line. He then projected a second line from a point 50 feet south of the center line of the main track extending in a northeasterly direction clearing all permanent obstructions to a point where it would intersect the main track. This point of intersection was 465 feet east from the center of the crossing on the main line. He also projected a third line from a point 42 feet south of the center line of the main line crossing and extending in an easterly direction clearing

any permanent obstructions and the box car located next to the east side of the crossing. This line runs close to the service track and almost parallel with the main line. This last line would intersect the main line in the vicinity of the crossing 2700 feet east from the center line of the crossing where the collision occurred. At this latter point of intersection the main line curves in a southerly direction and for that reason the last line projected would intersect it at a point 2700 feet east from the center line of the crossing. The purpose of exhibits C and D, was to show the condition of the crossing where the accident occurred, the elevators and other buildings on the south side of the service track and the freight cars located on each side of the crossing as well as the three tracks of the defendant's railroad. An examination of exhibit D, discloses that the plaintiff Ekren after crossing the service track had a clear view to the east of some 2700 feet and some 900 feet west of the crossing. The engineer on the train that collided with plaintiff's car testified that he applied the brakes in the near vicinity of the east siding one half mile east of the point of the accident. That he applied the brakes to their full capacity of 90 pounds. He continued braking until the train came to a stop about 900 feet west of the crossing and that he could not stop any sooner. Both the engineer and the fireman testified that the train was traveling at the rate of from 30 to 35 miles per hour when it was traveling into Kensal at the time of the accident.

The plaintiff testified that his driving position in the car was 8 feet back of the front end of the hood. The front end of the car would therefore be 8 feet beyond the point where the driver's view would be clear east and west. But since the distance between the north rail of the service track and the south rail of the main track was 43 feet 3½ inches there would still be a travel distance of 35 feet and 3½ inches before reaching the point of impact. His testimony was that he traveled from 6 to 8 miles per hour. Assuming that he traveled 7 miles per hour he would be traveling 10¼ feet per second; at that speed he

would cover the distance of 35 feet 3½ inches from the service track to the crossing on the main track in 3½ seconds. The train was traveling from 30 to 35 miles per hour. If it traveled 35 miles per hour it would travel 51⅓ feet per second, and must therefore have been 180 feet from the point of impact and in plain sight when the plaintiff was on the service track 35 feet 3½ inches from the same point. Had the plaintiff looked to the east at any time during the first 3 seconds he was traveling from the service track toward the main track he certainly would have seen the approaching train.

According to the plaintiff's own testimony he was quite familiar with the crossing having used it for the last 35 years and sometimes many times a day. His testimony relative to his familiarity with the crossing is as follows:

"The Court: After you drove your car on the crossing between these box cars, could you see east and to the west?

"The Witness: No, I could not because the cars were in so close. If the crossing had been opened like it should have been, like it is most of the time, then I could have seen everything at a glance.

"The Court: Well, your car passed across the first track, didn't it?

"The Witness: Yes.

"The Court: Then after you passed the first track, could you see east and west?

"The Witness: I could see—Well, not so good. I had to get out there so far; and, of course, in going across the crossing, I went across—I started to go across with the idea of going over the crossing.

"The Court: You intended to go clear across.

"The Witness: Go clear across, yes.

"The Court: You didn't stop in between there.

"The Witness: In order to stop in between the tracks, that would have been premeditated, you'd have to plan that; then it would be pretty hard to stop unless you planned it, you see? Well, those box cars hung over the tracks quite a bit; and I remember to my right was a big car, what you call an automobile car, and extra-big car right to my right. Several times, if there was any doubt when crossing that crossing—I have crossed it for thirty-five years—Well, we take the children to school because it's a hazardous crossing. We haven't allowed the boys to go over the crossing at all. My wife would say, 'Well, dad, you can drive the boys to school today,' she'd tell me; and sometimes she'd take them in."

It will be observed from his testimony that he knew that this crossing was a hazardous crossing and that he did not allow his boys to go over the crossing at all. So far as the record shows his mental faculties were normal nor does it appear that his sense of sight or of hearing was defective. As a prudent and careful man of ordinary intelligence, even though he looked to the left or west first, after passing the service track he still could have looked to the right or east before he attempted to cross the main track and would have then seen the approaching train and could have avoided the collision. Traveling at a rate of 10 or 11 feet per second, in two seconds he would have traveled some 22 feet and during that time the train traveling at 52 feet per second would have traveled 104 feet and at that moment would be less than 80 feet away from him.

Under the situation confronting the plaintiff when he was approaching the railroad crossing it was his duty to exercise the utmost care and to take necessary precaution for the safety of himself and his passengers. He stopped 25 to 30 feet from the service track at a point where his view was obstructed because of the location of the elevators and the box cars on the service track and thus was unable to see either east or west of the crossing. As the testi-

mony shows and to which we have referred, he had no intention to stop after crossing the service track but intended to cross all the tracks without further stopping. The place of danger was not on the service track because that crossing at that point was open; the place of danger was beyond the service track. It is difficult to understand how he could look west after crossing the service track but did not have time to look east when as a matter of fact he traveled some 35 feet after passing the service track. The question thus presented is whether the driver of an automobile may disregard ordinary care and prudence and deliberately run into danger, sustain injuries, and then hold the other party liable, even though such other party may have been negligent. In the instant case the plaintiff was thoroughly familiar with the crossing and surrounding circumstances and after he had crossed the service track there was nothing to obstruct his view either east or west of the crossing. As the evidence shows the visibility was good and there was no frost on the windshield or on the glass doors of the car he was driving. The plaintiff in this case did not stop, look and listen. He did testify that he looked to one side but that he did not look to the other where he could have seen the approaching train. There is no dispute as to his testimony in this regard.

The testimony of the plaintiff that he did not have time to look to the east or to his right is difficult to believe in view of the demonstrated facts:

"Testimony which is contrary to demonstrated or physical facts will not support a verdict. 2 Hyatt, Trials Sec. 1773, 1774. In the case of Shaver v. Davis, 175 Wis. 592, 185 N.W. 227, 230, the Supreme Court of Wis. said: 'It would probably seldom happen that a travelor would be excused from not knowing of the approach to a railroad track in broad daylight and such ignorance would generally defeat a recovery.' "

See also Marshall v. Northern Pac. R. Co., 58 N.D. 626, 227 N.W. 55, 56. We quote from a paragraph of the syllabus in that case:

"The evidence showing the existence of no obstacle within more than 35 feet of a railroad track, which would prevent one approaching a crossing from seeing an approaching train, the failure to take the necessary precautions to discover the presence of an approaching train, in the circumstances shown in the record, amounts to contributory negligence."

In the case of Schnell v. Northern Pac. R. Co., 71 N.D. 369, 1 N.W.2d 56, 62, this court said:

"The plaintiff's case simmers down to this: He was driving along a highway with which he was well acquainted; he was approaching a railway crossing that he well knew; he had driven over it many times; he knew it was his duty to look and listen, so he looked and listened; he says he heard no bell or whistle and that he was so blinded by the lights of the automobiles coming from the opposite direction he could see only along the north lane of the highway on which he was driving and could not see to the south whence he knew the railroad he was crossing came. * * * He cannot say that he looked and did not see when, if he had looked, he should have seen."

See also Zeis v. Great Northern R. Co., 61 N.D. 18, 236 N.W. 916. In the case of Brommer v. Pennsylvania R. Co., 179 F. 577, 580, 103 C.C.A. 135, 29 L.R.A.,N.S., 924, the United States Circuit Court of Appeals, Third Circuit said:

"The duty of an automobile driver approaching tracks, where there is restricted vision, to stop, look, and listen, and to do so at a time and place where stopping and where looking and where listening will be effective, is a positive duty."

To the same effect is the decision in the case of New York Cent. & H. R. R. Co. v. Maidment, 3 Cir., 168 F. 21, 25, 93 C.C.A. 413, in which the court said:

"The duty of an automobile driver approaching tracks where there is restricted vision to stop, look, and listen, and to do so at a time and place where stopping and where looking and where listening will be effective, is a positive duty, and these safeguarding steps the plaintiff failed to take. He stopped where stopping served no purpose, and failed to stop where stopping would have disclosed danger. He made chance, and not sight, the guarantee of his safety."

In the case of Miller v. Chicago R. I. & P. Ry. Co., S.D., 40 N.W.2d 324, 326, plaintiff sued the railway company for damages resulting from a collision between his trailer-transport and one of defendant's locomotives. Defendant contended that the collision was the result of plaintiff's contributory negligence. Plaintiff obtained judgment in the lower court and defendant appealed. The supreme court reversed the judgment and held that plaintiff was guilty of contributory negligence as a matter of law. The facts in the case were similar to the facts in the instant case. The plaintiff, before crossing defendant's tracks, had stopped at a point where he could not observe whether it would be safe to cross the tracks. In its opinion the court said:

"The fact that Miller stopped before reaching the tracks lying north of the freight depot is of no consequence. From the point of this stopping he could not have ascertained that it was or would be safe for him to cross the tracks where the collision occurred when he reached those tracks."

The court further quoted with approval the following from Vol. 3, Blashfield's Cyclopedia of Automobile Law, Permanent Edition Sec. 1826.

"Ordinarily where there is a duty, either specifically or under the particular facts as essential to due care, to stop for the purpose of looking and listening, the driver must, in order to fulfill such obligation, stop at a place where looking and listening will be reasonably effective. He is not deemed negligent in failing to stop at the time or place prior to that which the view becomes effective. Indeed, it is no discharge of the duty and does not absolve him from negligence, that he stopped at such prior time and place."

And in the case of Northern Pacific Railway Co. v. Tripp, 8 Cir., 220 F. 286, 290, a North Dakota case, the plaintiff obtained a judgment in the Federal District Court and the defendant appealed. In that case the defendant had made a motion for judgment, notwithstanding the verdict which motion was denied. In reversing the Judgment the circuit court said:

"In the present case the evidence is undisputed that the plaintiff was advised that his vision was limited at the time he looked to the east. He knew that it would grow more so until he approached the crossing over the house track, where it would be entirely cut off by the box cars to the east. After he passed this obstruction he looked constantly to the west, where obstructions prevented effective vision, and he was aware that he had not looked again to the east, and so continued until he reached the final danger point. The obstruction to the west, instead of being an excuse, was a warning not only that he was in danger from that direction, but also from the opposite direction, because of his lack of attention there. Under such circumstances, his duty was plain. He should have taken time in which to glance in the opposite direction, where the slightest glance would have shown his danger, or he should have exercised his control over his vehicle, so that he could listen for approaching trains, or have stopped it, if necessary, until he could use his senses of sight and hearing, and failure to do so was negligence on his part."

The factual situation may be briefly summarized as follows: There is no evidence in the case that the plaintiff was not a man

of ordinary intelligence or that his sense of sight or of hearing was defective. He was familiar with the crossing where the collision occurred, having used it for 30 to 35 years, and he admitted that it was a hazardous crossing. Notwithstanding these facts, on the morning of the accident he stopped before crossing the house track at a point where stopping was of no consequence since at that point his view both east and west was obstructed; yet according to his own testimony he proceeded to cross all three tracks without any intention to stop, and without looking to the east where he could have seen the approaching train. He was traveling at a speed of from 10 to 11 feet per second. During the time he was traveling from the service track to the main track he certainly had time to look both east and west. He looked to the west but not to the east. The visibility was good, and there was no frost on the windshield or on the windows of his car. He could have looked to the east and would then have seen the approaching train which was less than 200 feet away. We cannot escape the conclusion that upon the record and the evidence the plaintiff was guilty of contributory negligence as a matter of law which contributed proximately to the collision.

The judgment of the district court is reversed and the action dismissed.

MORRIS, C. J., and CHRISTIANSON, GRIMSON and BURKE, JJ., concur.