Bobby L. WHEAT, Plaintiff and Respondent,

v.

William F. PATTERSON, Defendant and Appellant.

No. 8398.

Supreme Court of North Dakota.

Nov. 16, 1967.

Shaft, Benson, Shaft & McConn, Grand Forks, for defendant and appellant.

Pringle, Herigstad, Meschke, Loder, Mahoney & Purdy, Minot, for plaintiff and respondent.

TEIGEN, Chief Justice.

The defendant has appealed from an adverse judgment in a tort action for personal injuries sustained by the plaintiff in an automobile accident in which the defendant was the host driver and the plaintiff his guest. The case was tried to the court without a jury and the defendant has demanded a trial de novo in this court.

The plaintiff has alleged willful misconduct and gross negligence on the part of the defendant as the proximate cause of his injuries. The defendant has denied these allegations and has pleaded the affirmative defenses of assumption of risk and contributory negligence. We review the evidence in the light of the following governing principles as they apply to issues framed in this case. The appeal is here for trial anew of the entire case upon the

record made in the trial court pursuant to Section 28-27-32, N.D.C.C.

■ The plaintiff has the burden of proof to prove by a fair preponderance of the evidence that his injuries were proximately caused by the willful misconduct or gross negligence of the defendant. Holcomb v. Striebel, N.D., 133 N.W.2d 435; Anderson v. Anderson, 69 N.D. 229, 285 N.W. 294.

The guest statute, Section 39-15-03, N.D.C.C., provides that the owner, driver, or person responsible for the operation of the vehicle shall be liable to the guest only where "injury to or death of a guest proximately resulting from the intoxication, willful misconduct, or gross negligence of such owner, driver, or person responsible for the operation of such vehicle."

Gross negligence is to all intents and purposes, no care at all. It is the omission of the care which even the most inattentive or thoughtless seldom fail to take of their own concerns. It evinces a reckless temperament. It is a lack of care which is practically willful in its nature.

Rokusek v. Bertsch, 78 N.D. 420, 50 N.W.2d 657.

See also Anderson v. Anderson, supra; Holcomb v. Striebel, supra.

Willful misconduct in relation to the "guest statute," denotes intentionally doing that which should not be done or failing to do that which should be done, with knowledge, express or implied, that injury to a guest will probaby result or with reckless disregard of the possibility that injury to a guest may result.

Rokusek v. Bertsch, supra.

The defendant, by his answer, has pleaded the affirmative defenses of assumption of risk and contributory negligence and has, therefore, asserted the affirmative of an issue that must be determined if it is found the plaintiff has sustained the burden of proof as to his claim.

■ Either assumption of risk or contributory negligence is a complete defense to recovery but the defendant has the burden to prove the same by a fair preponderance of the evidence. Fagerlund v. Jensen, 74 N.D. 766, 24 N.W.2d 816; Moe v. Kettwig, N.D., 68 N.W.2d 853; Olson v. Cass County Electric Cooperative, Inc., N.D., 94 N.W.2d 506; Serbousek v. Stockman Motors, Inc., N.D., 106 N.W.2d 879; Ekren v. Minneapolis, St. Paul & S. S. M. Ry. Co., N.D., 61 N.W.2d 193.

■ The defenses of assumption of risk and contributory negligence in guest cases, being affirmative defenses, presuppose negligence on the part of the defendant as a proximate cause of the injury. Both of these defenses arise in Section 9-10-06, N.D.C.C., which provides as follows:

Every one is responsible not only for the result of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter, willfully or by want of ordinary care, has brought the injury upon himself. * * *

The affirmative defenses of assumption of risk and contributory negligence, as applied to guest cases, were defined in Borstad v. La Roque, N.D., 98 N.W.2d 16, at p. 25, as follows:

As applied to the defense raised by the host driver in an action by his guest passenger where liability of the host arises in tort, the guest will be deemed to have "assumed the risk" of injury arising from the mishap when (1) the guest has knowledge of a situation that is dangerous beyond that normally inherent in the operation of a vehicle whether caused by the obvious incompetence of the driver or by the dangerous condition of the vehicle, or otherwise, (2) an appreciation of the danger and a voluntary choice to

encounter it, and (3) an injury proximately caused by the danger presented. * * *

Contributory negligence, on the other hand, arises from the failure of the guest, in the same situation, to exercise ordinary care for his own safety * * *.

We also said in Borstad v. La Roque, supra:

The defense of assumption of risk, when applicable as a bar to recovery, operates independently of negligence and proximate cause, except merely to expose the injured claimant to the danger, whereas, it is an essential feature of the defense of contributory negligence that the negligence of the injured claimant be a proximate cause of the mishap and the resultant injury.

■■ In the light of the foregoing principles of law we will now find the facts, keeping in mind that on a trial de novo to the Supreme Court on appeal the findings of the trial court are entitled to appreciable weight, especially when based on testimony of witnesses who appeared in person before the trial court. Grabau v. Hartford Accident & Indemnity Co., N.D., 149 N.W.2d 361; 501 DeMers, Inc. v. Fink, N.D., 148 N.W.2d 820; Gress v. Gress, N.D., 148 N.W.2d 166. Although the findings of the trial court are entitled to appreciable weight, this court, on appeal, is not bound thereby on trial de novo. We must still find the facts independent of the trial court's findings. McKenzie v. Hanson, N.D., 143 N.W.2d 697; Adams v. Little Missouri Minerals Association, N.D., 143 N.W.2d 659; C.I.T. Corporation v. Hetland, N.D., 143 N.W.2d 94.

The evidence establishes without dispute or contradiction that the accident in which the plaintiff was injured happened about 7:30 p. m. on December 23, 1963, at a point on State Highway 5 approximately two and one-half or three miles east of Mohall, North Dakota. Highway 5 at this point was a two-lane blacktop or asphalt-surfaced highway and the parties were driving westerly on their way to Mohall. It was a clear, cold evening and the highway was in good driving condition, except for some slipperiness due to frost. The defendant was the owner of a 1963 Volkswagen which he was driving and the plaintiff was seated beside him in the front seat. Mr. Cruse and Mr. Trainer were seated in the back seat. All four were returning to their respective homes at Mohall after a day's work at the Minot Air Force Base where all four men were employed by The Boeing Company. The men commuted each day to the Minot Air Force Base. Patterson and Cruse were supervisory employees of Boeing and the employer paid them a stipend to defray the cost of their transportation. Wheat and Trainer did not receive payment for transportation to and from work. An arrangement had been in effect for several months whereby Patterson and Cruse alternated in driving with Patterson driving his car most of the time. Wheat and Trainer rode with them as their guests.

The four men had driven from Mohall to the Minot Air Force Base in the morning, reported for work at about 7:30 a. m. and worked until 4:15 p. m., after which they met at the NCO Club located on the Base. They remained at the NCO Club for about one and one-half hours during which time they each had three or four drinks. Peanuts and potato chips were consumed along with the drinks. The four of them left the Air Base in the Patterson Volkswagen for Mohall, a distance of about 32 miles. Enroute they stopped along the highway for ten or fifteen minutes to allow Cruse to relieve himself. The plaintiff and the defendant continued a discussion or argument about working conditions. The defendant was the plaintiff's supervisor at Boeing. A State highway patrolman came along while they were stopped and spoke with Patterson and Cruse, who were outside the automobile. The patrolman asked if there was anything wrong and, upon receiving a negative answer, warned that the roads

were getting a little slippery from frost and cautioned them to drive carefully. The men then proceeded toward Mohall but stopped for about 15 or 20 minutes at a tavern in Lansford which was off the regular route but not out of the way. Each had another drink and bowled on a bowling machine. They again proceeded toward Mohall on a graveled road until it intersected with Highway 5 east of Mohall where they made a left turn onto Highway 5. A short time after they turned onto Highway 5 the accident occurred.

It is also undisputed that the defendant's driving from the Minot Air Force Base to Highway 5 was normal. There was nothing about it that would indicate he was careless, reckless, or incompetent. Each of the passengers testified that there was no room for complaint on the skill with which the defendant had operated the automobile. There is nothing in the record whatsoever to indicate that any of the passengers had knowledge or appreciated that a situation existed caused by incompetence of the driver which was dangerous beyond that normally inherent in the operation of a vehicle during the journey from the Minot Air Force Base to the junction with Highway 5, a distance of approximately 30 miles.

It is also undisputed that the blacktop surface of the highway where the accident happened had some frost on it and was somewhat slippery. It is agreed that the defendant lost control of the vehicle, that it slid on the highway zigzagging back and forth for some distance and that it then struck the left shoulder and rolled ending up on its top in the ditch. There is, however, a dispute in the testimony as to what occurred immediately before the defendant lost control of the vehicle.

The plaintiff, in respect thereto, testified as follows:

Q. Now, after turning onto Highway 5 and proceeding in a westerly direction toward Mohall, was there anything about Mr. Patterson's driving that alarmed you?

A. Yes, there was.

Q. Would you describe how he drove from this point on?

A. Well, as we turned on the highway, Bill started cutting the car, jerking the steering wheel back and forth and then letting the car settle back and telling us how the car—He just got this Volkswagen and showing us the stability of the Volkswagen. He said, "Watch this, watch that," cutting back and forth eight or nine times.

Q. Would he turn the steering wheel?

A. He was steering it back and forth, fishtailing the car back and forth and saying, "See how it stabilizes itself?"

Q. Did you say anything when he started this course of driving?

A. I told him, I asked Bill—Someone in the back seat said, "Now Bill, knock it off," something to that effect, both the boys in the back seat did and he kind of laughed and cut it again. And I said—They all knew that I was very scared of cars and I said—Well, I found this handle on the Volkswagen and what you would call a "chicken handle" and I was holding on the handle and Patterson kept right on swerving the car.

Q. Where was this handle located?

A. It's on the dash, on the right hand side opposite the driver's side.

Q. Did you take hold of the handle when he started this driving behavior?

A. Yes, I did.

Q. Did you say anything to Mr. Patterson concerning his driving; did you protest his driving?

A. Yes. I asked Bill—I didn't want to disturb him. He's highly sensitive and I asked Bill, "Knock it off. You're going to turn your car over." And someone in

the back seat, I think it was Dave, said something to the effect, he had one of these for two years and it is pretty hard to turn over. And he went on down the road and about that time Bill took the car over to the right side, completely over to the right side, over to the left side, cut it back again to the right side and when he cut it back again, the car went into a skid sideways down the road for, I don't know, 30, 20 or 30 feet and fishtailed back again and he hit the brakes, apparently, and I said, "Look out. My God, we're going over and—"

Q. You did then go over?

A. Yes.

Q. Now, before the final maneuver, turning the car over, he had been turning the wheel and causing the car to swerve and fishtail prior to that?

A. Yes.

Q. And how many times did he carry out this maneuver before he finally turned it over?

A. I don't remember, eight, ten, twelve, fifteen, I don't know how many times. He just kept it up.

The passenger Trainer testified:

Q. What did you observe about his driving at this point?

A. Up 'till about, I'd say a mile and a half after we had turned onto the road it was all right. And then it came to the conversation, we were talking about automobiles and—

Q. Speak up a little louder, please.

A. —and he started this jerking bit, jerk the steering wheel and he was letting go.

Q. Would this cause the car to swerve?

A. Yes, it did.

\*      \*      \*      \*      \*      \*

Q. Describe the movement of the car?

A. It was quite jerky.

Q. Did you say anything about the driving?

A. Yes.

Q. What did you say?

A. I said, "We better quit this."

Q. Did you protest to Mr. Patterson?

A. Yes.

Q. What did he say, if anything?

A. He quit for a—momentarily.

Q. Did he resume it again?

A. He resumed it again.

Q. How often, if you can tell us, Mr. Trainer, did this jerking of the car by Mr. Patterson occur before the car finally rolled?

A. How many times had he done it?

Q. Yes, both sessions; in the session that you were testifying to and describing preceding the rolling of the car. How much did he jerk the car, approximately, before the car rolled?

A. I'd say a minimum of ten.

Q. Was there any conversation at all, that you recall, about Mr. Patterson with reference to what he was doing?

A. Well, he was telling us to watch.

\*      \*      \*      \*      \*      \*

Q. What did Mr. Patterson say with respect to his driving behavior or the act of turning and jerking the car?

A. He would say, "See, you don't have to bring it back down. It comes down by itself; it comes back down by itself."

Q. Do you remember the car rolling?

A. Yes.

Q. Would you describe what happened when the car rolled, Mr. Trainer? Do you recall just before it rolled?

A. Just before it rolled? Well, it was— we were in another jerk. He had jerked it once again and he cut it with his hand, evidently and it went toward the right side of the road and it went over into the snow. And to keep from going into the ditch, he pulled it hard to the left and then we went, oh, about a 45 degree angle across the highway and he turned it right real sharp. Then we started sliding and we then rolled over.

The passenger Cruse testified by deposition taken in the State of Washington as follows:

Q. Was there any playing around or horseplay on the part of Patterson in relation to driving the car before the accident happened?

A. Only at the time of the accident. It would be 45, 30 or 45 seconds before the accident. Not at Lansford or in between the base anywhere. Only right at the time of the accident. The zigzagging across the highway part of the accident. That, I remember.

* * * * * *

Q. Did you notice any deliberate moves of the steering wheel by Mr. Patterson?

A. Only right before the accident, right before we went into the ditch, I could. Once I had been aware of what he was doing, I could see in the front, I could see Bill's hands moving the steering wheel back and forth (demonstrating) just before we went.

* * * * * *

THE WITNESS: I wasn't paying too much attention until he started weaving from side to side on the road, when we lost control of the car.

* * * * * *

Q. Now, you say he was weaving from side to side. Would you describe that action of the automobile?

A. He was driving on both lanes of the highway. I am not positive, but I believe he was demonstrating the roadability of a Volkswagen.

* * * * * *

Q. I am asking you now, Mr. Cruse, to explain Mr. Patterson's driving after you turned west on U. S. Highway 5?

* * * * * *

A. Well, evidently I didn't answer it. What I meant to say was that he took the wheel when he was driving and he turned it from one side of the road to the other side, using both lanes, oncoming and the lane we were in. And then he lost control of the car on the left hand side of the highway and went into the ditch and rolled over.

Q. This action that you describe of turning the wheel back and forth in operating the vehicle in both lanes, did this happen more than once before the accident?

A. Four or five times before we lost control of the car.

Q. How long a period of time, or distance, was there from the time he commenced this action until the time the car rolled over?

A. Thirty seconds; forty-five seconds.

Q. And you were traveling at what speed?

A. Forty-five; that's estimated.

Q. Sitting in the back seat, could you feel—would you describe what you felt?

A. I could feel my body shifting from side to side in the car. There is not too much room in the back of a Volkswagen when there's two people in it.

Q. And then the car did turn over?

A. Yes. The left rear wheel went on the shoulder, off the shoulder on the left hand side of the road.

The defendant Patterson testified by deposition taken in Florida and gave his version as to what occurred as follows:

A. We were driving along about 35 miles an hour, we were talking back and forth, the wheels on the right hand side of the car got too close to the edge and I jerked the wheels back to the left.

Q. Why?

A. To pull the car back. The car jerked a little bit and when I did this, the car started sliding and I slammed on the brakes and the rear end started fishtailing, caught up with the front end. We did this down the road about twenty yards and I said to the follows, "We are going over," and we went over in the ditch.

Q. Did it turn over?

A. Yes, on the top.

Q. Did the car come to a stop in the ditch?

A. It slid about 25 feet and came to rest on the right hand side.

On cross-examination, he testified:

Q. Your driving was steady and consistent all the way?

A. Yes, sir.

Q. You did no playing around?

A. No, sir.

Q. You engaged in no horseplay with the vehicle?

A. No, sir.

Q. None of the occupants suggested that you stop playing around?

A. No, sir.

Q. Had you been veering the automobile or jerking the steering gear to make it swerve?

A. No, sir, I hadn't.

Q. Except you did just before the accident?

A. When the car started off the right side of the road, I jerked it to the right.

Q. Why was it jerking?

A. We were talking back and forth and I probably wasn't paying as much attention as I should have been.

* * * * * *

Q. At the point of the accident, when you started to skid, what direction did you slide?

A. I was sliding sideways up the road as you would come back and drive the other way, depending on which way I turned the wheel. It fishtailed back and forth.

Q. For what distance?

A. I'd say approximately 25 yards.

Q. And in that distance, it slid several different ways, if I gathered your description right?

A. Yes, to the left and right, depending on how I turned the wheel.

Q. Were you turning the wheel sharply?

A. I don't know how sharply I was turning but I was trying to get the car under control.

Q. At thirty-five miles an hour?

A. Yes, sir.

Q. Was the slide entirely on the highway?

A. Yes, sir.

Q. Which lane of traffic?

A. When it was sliding, it probably lapped over into both lanes of traffic.

Q. Did it slide off the higway?

A. No, sir; not until we rolled.

Q. In other words, it was still on the highway when you rolled?

A. No, sir. When we started to roll, we were headed to the left ditch.

The trial court found that the preponderance of the evidence establishes that the defendant was actually demonstrating the roadability of the Volkswagen automobile as claimed by the plaintiff. The plaintiff protested these maneuvers and, although plaintiff protested, there was nothing he could have done about it as grabbing the steering wheel would have been more dangerous. The trial court determined that these actions on the part of the defendant constituted gross negligence and willful misconduct, which were the proximate cause of the accident and the resulting injuries to the plaintiff.

The trial court found the plaintiff had not assumed the risk and was not contributorily negligent. It, therefore, found in favor of the plaintiff and assessed the damages.

On the basis of the evidence adduced, we find it preponderates in favor of the plaintiff as to his claim. The highway was somewhat slippery from frost which the defendant knew or should have known, particularly in view of the fact that he had been warned by the highway patrolman. We find he attempted to demonstrate the roadability of his Volkswagen by turning it sharply and then letting go of the steering wheel to demonstrate that the car would straighten itself out. He did so on a number of occasions, which action on the part of the defendant caused him to lose control of the vehicle and resulted in the vehicle overturning in the lefthand ditch causing injury to the plaintiff.

Under the conditions as they existed, such action in our opinion constituted gross negligence. It was a lack of care which was practically willful in its nature. It constituted an omission of care which even the most inattentive or thoughtless seldom fail to take of their own concern. Further, it was intentionally done with a reckless disregard of the possibility that injury to a guest might result. We think, therefore, that the trial court was correct in further

finding that the action on the part of the defendant, which caused injury to the plaintiff, was also willful misconduct.

The question still remains whether the plaintiff assumed the risk incident to the defendant's operation of the Volkswagen which caused the plaintiff's injuries. As we stated above, the burden of proof is upon the defendant to establish by a fair preponderance of the evidence that the plaintiff assumed the risk or was contributorily negligent.

The defendant takes the position that if his acts constituted gross negligence or willful misconduct, his conduct was superinduced by intoxication, which fact, if true, was known or should have been known by the plaintiff who consumed drink for drink with him. He must, therefore, be charged with actual knowledge of defendant's condition and, therefore, he assumed the risk.

The defendant cites Christopherson v. Christensen, 258 Iowa 648, 140 N.W.2d 146, in support of the rule which he argues should be applied in this case, quotes therefrom the following statements from the text:

The evidence of defendant's intoxication is not great. As stated, we do not speculate on how much beer can be consumed over a period of eight hours without causing intoxication. It is doubtful that intoxication can be proven in that manner. Here there was testimony by one who observed the defendant and plaintiff in Carroll near midnight that they did not appear to be intoxicated. The doctor who treated defendant in Coon Rapids did not believe he was intoxicated. He testified defendant suffered a brain concussion in the accident, a loss of memory, "retrograde amnesia", and attributed his reactions after the accident to the injury rather than to beer he may have consumed. Thus the only evidence tending to prove intoxication was the beer consumed by his own admission and the testimony of

the party who found him at the scene shortly after the accident occurred. We think it was insufficient.

On the other hand, it clearly appears decedent was aware of defendant's drinking after work, was with him from about 10 P.M. until the accident, consuming drink for drink with defendant, and must be charged with actual knowledge of his condition when they started home from Carroll.

\*　　\*　　\*　　\*　　\*　　\*

The conclusion is, therefore, inescapable that the doctrine of assumption of risk applies, and as a matter of law plaintiff cannot recover, and the court's action in sustaining defendant's motion for judgment notwithstanding the verdict must be affirmed.

Christopherson v. Christensen, supra, relies on two previous Iowa cases—Reeves v. Beekman, 256 Iowa 263, 127 N.W.2d 95, and Garrity v. Mangan, 232 Iowa 1188, 6 N.W.2d 292. All three of these were guest cases in which the guest attempted to recover from the host driver for injuries sustained, alleging as a cause the intoxication of the host. The court did not find that the host driver was intoxicated in any of the three cases and said, for this reason, the plaintiff could not recover. However, the court reasoned that if the host driver had become obviously drunk or intoxicated, the host would have sustained the burden of proof to prove his affirmative defense of assumption of risk because in each of the cases the host and the plaintiff guest had spent considerable·time together drinking intoxicating liquor. If, as a result thereof, the host had become obviously drunk, it would have been obvious to his companion who was with him and, with that knowledge, he made his choice to remain the host's guest. Having in *Christopherson* failed in his burden of proof, the plaintiff guest could not recover and it was unnecessary to decide that the guest had assumed the risk.

Therefore, it is this writer's view that the statement quoted from Christopherson v. Christensen, supra, and supplied us by the defendant in his brief, is dicta. We need not pass on the question in the case at bar for the reason that there is no evidence that the defendant was intoxicated, except the fact that over a course of about three hours and twenty-five minutes the defendant had four drinks.

All of the evidence relative to defendant's conduct, except for a few seconds before the occurrence of the accident, was to the effect that the defendant's driving and conduct were normal and there was no indication that his conduct was superinduced by intoxication. The defendant did not so testify in his deposition read at the trial. Counsel for the defendant attempted to elicit from the other witnesses evidence relative to the defendant's conduct as a result of having consumed intoxicating liquor and its effect upon him, if any, without avail.

The witness Trainer on cross-examination was asked:

Q. Did you observe anything about him [the defendant] that would lead you to believe why he was not acting in a prudent manner?

\*　　\*　　\*　　\*　　\*　　\*

Q. Did you observe what effect, if any, having drank alcoholic beverages had on him?

\*　　\*　　\*　　\*　　\*　　\*

Q. Did it make him argumentative?

\*　.　\*　　\*　　\*　　\*　　\*

Q. Did it make him demonstrative?

\*　　\*　　\*　　\*　　\*　　\*

Q. Did it change him at all?

\*　　\*　　\*　　\*　　\*　　\*

Q. Do you feel the liquor he drank had any effect on him?

\*　　\*　　\*　　\*　　\*　　\*

Q. Do you believe the liquor had anything to do with his driving?

The answers to all of the foregoing questions were in the negative.

All of the evidence relative to the defendant's conduct and demeanor, except for a few seconds before the accident, was to the effect that his driving and conduct were normal. There was no indication, prior to the zigzagging, that the defendant may have been intoxicated, nor does the evidence establish that he zigzagged because he was intoxicated or because he drank liquor.

■ The defendant had a new Volkswagen. There was conversation about automobiles. The defendant began to demonstrate the roadability of his Volkswagen. The plaintiff was afraid in the automobile and grabbed the "chicken handle." The highway was somewhat slippery from frost. The passengers remonstrated with him but he did not desist from his conduct, except perhaps for a short period. Whatever the reason for the defendant's actions, it is not shown by the record in this case that it was a cause that existed before they turned onto Highway 5 nor that the plaintiff had knowledge of a situation that was dangerous beyond that normally inherent in the operation of the vehicle. There is no evidence of incompetence of the defendant as a driver because he drank intoxicating liquor. We agree with the Iowa court and find in this case that evidence of the drinks, standing alone, was insufficient. We find the defendant has failed to establish by a preponderance of the evidence that the plaintiff assumed the risk or that he was contributorily negligent.

■ No issue has been raised or argued pertaining to the amount of damages awarded by the trial court. The plaintiff was severely injured. He sustained a cervical neck injury requiring medical and surgical treatment, including two neurological surgical procedures, hospitalization, temporary total disability and permanent partial disability, together with pain and suffering. According to the evidence, he is still suffering a 35% permanent disability of the cervical spine and 20% disability for impairment of the whole body. He was only 34 years of age and had a life expectancy remaining of 36.69 years at the time of the accident. He proved special damages of $11,688.97 which were allowed. The court also allowed $5,000 for pain and suffering, $12,500 for permanent disability, and $10,500 for impairment of future earning capacity, making a total of $39,688.97. In our view and under the evidence, we consider the award proper.

The judgment of the trial court is affirmed.

STRUTZ, ERICKSTAD, KNUDSON and PAULSON, JJ., concur.